AUGUST C. SWARTH *et al.*

*v.*

THE PEOPLE *ex rel.* Paxton.

*Filed at Mt. Vernon May 15, 1884.*

1.   LICENSE TO KEEP A DRAM-SHOP—*as to the necessity of a petition by voters—statute not applicable to cities.*   The statute requiring a petition of voters in the town or election precinct to be had and presented before the issue of a license to keep a dram-shop, has no application to licenses granted by a city.

2.   SAME—*application for license not essential.*   A previous application in writing is not essential to the validity of a license granted by a city to keep a dram-shop.   It is enough in this respect that it be issued, and accepted by the licensee.

3.   SAME—*by whom license may be issued.*   The statute gives the power to grant licenses in a city to the city council, but that body may, by ordinance, grant licenses to a certain class of persons, upon certain conditions, by authorizing the mayor to issue or cause license to be issued when the conditions are complied with.   In such case the issuing of the license by the mayor is a lawful exercise of the power of the council.

4.   SAME—*of the manner of signing a license.*   It is not essential to the validity of such a license that the signatures of the mayor and city clerk be affixed with a pen.   Such signature may be lawfully affixed by stamping a *fac simile* of the written signature of such officer, if done by him, or by another under his direction or at his request.

5. SAME—*as to time of expiration of license—extending the municipal year.* It is no objection to a license that the ordinance fixing the time when it shall expire was passed before an ordinance extending the municipal year to the same time. It is sufficient if the extension is made before the license is issued. But a license issued to extend to a time beyond the end of the municipal year, would be valid for so much of the period named therein as did not extend beyond the end of the municipal year.

6. SAME—*taking out new license before the expiration of former one.* The fact that a party has an unexpired license to keep a dram-shop when he takes out a new one, can not affect the validity of the new one.

7. SAME—*taking out license under an existing ordinance passed in anticipation of the going into effect of a law fixing a higher license fee— construction of the act of 1883.* The act of June 15, 1883, fixing the minimum license fee for keeping a dram-shop at $500, relates solely to licenses to be issued *after* the act went into effect—the first day of July next after the date of the passage of the act. It was not intended to invalidate licenses lawfully issued *before* that time.

8. On the 18th of June, 1883, three days after the passage of the act above mentioned, but before it became operative as a law, the city of Chicago passed an ordinance fixing the fee for licenses which might be issued thereafter, and prior to the first day of July, 1883, the date at which the act of June 15 would take effect, at $103, and providing further, that licenses issued under that ordinance, unless sooner revoked, should expire on the first Monday of April, 1884, about nine months after the act of June 15, fixing the minimum license fee at $500, would go into effect, and beyond the term of the then current municipal year, when the statute on that subject provided that no such license could lawfully extend beyond the municipal year in which it was granted. But on the 28th of June, 1883, the city passed another ordinance, changing the time at which the municipal year should begin and end, and also extending the current municipal year to the same time, so that licenses issued under the ordinance of June 18 would not extend beyond the municipal year in which they were granted. Licenses were issued under this ordinance, and their legality was questioned, on the alleged ground that the whole proceeding was an attempted evasion, and in fraud of the higher license act of 1883.

9. It was *held,* however, that although it *was* the intention in the passage of the ordinances of June 18 and June 28 to anticipate the taking effect of the act of June 15, and to enable persons in Chicago to procure licenses before that act should go into force—July 1, 1883—at a rate less than $500 a year, under which they might keep, in that city, dram-shops until April, 1884, the passage of the ordinances being but the exercise of powers in compliance with then existing laws, licenses issued under such ordinances were lawfully issued. The purpose attributed to the city in the action taken, to afford cheaper licenses to those who might procure them before the act should go into effect, than could be obtained afterward, was an entirely legitimate one.

10. QUO WARRANTO—*lies to test validity of license to retail intoxicating liquors.* Under our present statute, as amended in 1881, an information in the nature of a *quo warranto* lies to test the validity of a license to keep a dram-shop.

11. SAME—*of the pleadings and proof.* On an information in the nature of a *quo warranto*, the defendant can not put in a general denial of wrong and then await the proof of the relator. A plea of not guilty will not prevail. The defendant must disclaim, or avow and justify, his claim, and the burden of proof rests upon him if his claim is denied.

APPEAL from the Superior Court of Cook county; the Hon. ELLIOTT ANTHONY, Judge, presiding.

This is an appeal from a judgment of the Superior Court of the county of Cook, purporting to oust appellants from the exercise of "the franchise, privilege and license of selling intoxicating liquors at retail, in less quantities than one gallon," and imposing a fine upon them for usurping "the franchise, privilege and license described in the information," which was "the franchise and privilege of keeping a dram-shop and liquor saloon, and of selling intoxicating liquors at retail, in less quantity than one gallon." This judgment is founded upon an information by the Attorney General, in the nature of a *quo warranto*, to test the validity of the license of appellants, purporting to have been issued to them on June 29, 1883, by the mayor of the city of Chicago, under the corporate seal of the city, and signed by the mayor and clerk, and purporting to license appellants "to keep a saloon or grocery at 385 and 387 N. Clark street," in Chicago, and "to sell, barter," etc., "wines and other liquors, whether malt, vinous, ardent or fermented, in quantities less than one gallon, from the date thereof until the first Monday of April, 1884." The plea of appellants justified the keeping of a dram-shop under this license, and in response to a suggestion in the information, the plea claims that the act of June 15, 1883, (commonly known as the "Harper High License law,") is unconstitutional and void. Various objections to the license were raised by the replications.

By ordinances in force in Chicago at the time of the passage of the act in question, (June 15, 1883,) all saloon licenses expired on the last day of June next after the date of their issue, (sec. 1852, Revised Ordinances,) and by statute no such license could lawfully extend beyond the municipal year in which it was granted, (sec. 46, chap. 24,) and the current municipal year in Chicago never having been fixed by ordinance, would, unless changed by ordinance, terminate on the 1st day of April, 1884. (See sec. 88, chap. 24, and sec. 48, as amended March 9, 1877.) The act approved June 15, 1883, in force July 1, 1883, provides, "that *hereafter* it shall · not be lawful for the corporate authorities of any city *to grant a license* for keeping a dram-shop, except on payment, in advance, into the treasury of the ·city granting the license, such sum as may be determined by the authorities of such city, not less than at the rate of $500 per annum," etc. On June 18, 1883, an ordinance was passed by the city of Chicago, providing that "every such license hereafter granted, unless sooner revoked, shall expire on the first Monday of April next thereafter. For every such license issued hereafter, and prior to July 1, 1883, there shall be paid the sum of $103." It will be·observed that the first Monday of April, 1884, occurs on the 7th day of that month, while the current municipal year, as then defined, would end on the first Tuesday of April, which, in 1884, occurs on the 1st day of that month, and thus the ordinance of June 18, 1883, provided for the expiration of such licenses on a day beyond the period of the then municipal year. On June 28, 1883, another ordinance was passed, fixing the Monday after the first Tuesday of April for the beginning and ending of the municipal year, and extending the current municipal year to the 7th day of April, 1884, which is the first Monday after the first Tuesday.

On June 15, 1883, appellants were keeping a dram-shop in the city of Chicago, under a license issued to them by the city before that time, which, under the ordinances and laws

then in force, and on its face, would expire on June 30, 1883. On June 29, 1883, after the current municipal year had been extended to the first Monday of April, 1884, by the ordinance of June 28, *supra,* and after the price of such license had been fixed, as above stated, at $103, and one day before their then license would expire, and•two days before the act of June 15 came into force, appellants, without any application made therefor in writing, and without any petition signed by a majority of the voters of the town, election precinct or district in which their dram-shop is located, received a license from the city on payment of $103, and giving the bond required by law, under the signatures of the mayor and city clerk, and under the seal of the city, authorizing them to keep a dram-shop at the place named, in the city, from that date until the first Monday of April, 1884. The signatures of the mayor and city clerk were not written by them with a pen, but were stamped on the license by some other person. The objections presented to the validity of this license were, that the license was granted by the mayor, and not by the city council; that there was no previous application therefor made in writing; that the signatures were not signed to the same by the mayor and city clerk, but were stamped thereon by some other person; that a prior license was outstanding when it was issued; that the same was not issued in compliance with the High License law of June 15, 1883; that the ordinances of June 18 and June 28, and the issue of this license, constitute a fraud upon that statute, and that all these things were done for the fraudulent purpose of defeating the object of that statute, and the ordinance of June 18 extended the period of the license beyond the then municipal year.

Mr. AUSTIN BIERBOWER, Mr. HARRY RUBENS, and Mr. EDWARD ROBY, for the appellant.

Mr. F. S. WINSTON, Jr., for the city of Chicago.

Mr. JAMES McCARTNEY, Attorney General, Mr. GILBERT L. MILLER, assistant, Messrs. C. C. & C. L. BONNEY, and Mr. JAMES L. HIGH, for the appellees.

Mr. JUSTICE DICKEY delivered the opinion of the Court:

The court is unanimous in the opinion that the act of June 15, 1883, called the "High License law," is valid and constitutional. That question was settled by the decision in *Timm* v. *Harrison,* (*ante,* p. 593,) and needs no further discussion here. A majority of this court, after careful consideration, are of opinion that the judgment in this case should be reversed, and the information dismissed, and that is the judgment to be entered in this case.

We think the license set up by appellants is a valid license, and justifies their right and lawful authority to retail liquors, as claimed by them. A previous application in writing is not essential to the validity of such a license. It is enough, in this respect, that it be issued, and accepted by the licensees. Nor is it essential that the signatures of the mayor and city clerk be affixed with a pen. Such signature may be lawfully affixed by stamping a *fac simile* of the written signature of such officer, if done by him, or by another under his direction or at his request. The fact that the license was not granted upon the petition of voters in the town or election precinct, is not important, as the statute on that subject has no relation whatever to licenses granted by a city. It is true, the ordinance prescribing the duties of the mayor in issuing licenses, says that he shall, under certain circumstances, "*grant*" licenses to certain persons, while the statute authority to "*grant*" such licenses is given only to the city council; but the substance of the ordinance is, that the city council grants licenses to a certain class of persons, upon certain conditions, by authorizing the mayor to "grant,"—that is, to issue,—or cause license to be issued, when the conditions are

complied with. This is not a delegation to the mayor of the power of the council. We see no objection to the *form* in which this power of the council is exercised, or the mode in which the license was issued.

Nor do we think it of the slightest importance that the ordinance fixing the time when the license shall expire was passed before the ordinance extending the municipal year to the same time. It is sufficient that at the time when the license was issued the municipal year had been extended, so that the period of the license was not beyond that of the municipal year. We think a license issued to extend to a time beyond the end of the then municipal year would nevertheless be valid for so much of the period named as does not extend beyond the end of such municipal year.

The objection that appellants, on the day they received their license, had already a former license under which they might have continued to sell for another day, can not affect the validity of the present license. No legal difficulty seems to exist to a man buying as many licenses as he chooses, to do the same thing. Each of them, if in other respects unobjectionable, would permit him to do the thing in question. Were this otherwise, the acceptance of the new license would be regarded as a surrender of the old.

The most important objections, and those most strenuously pressed upon our attention, are the allegations, first, that by a true construction of the act of June 15, 1883, it provides, "that after the date at which the act went into force it shall not be lawful for any person to sell intoxicating liquors except upon compliance with the act,"—that is, without having a license for which he has paid in advance at a rate not less than $500 a year; and second, that the passage of the ordinances passed after June 15, 1883, and the issuing of the license under the same, in the manner in which these things were done, is a fraud upon that statute, and that these proceedings were an unlawful and fraudulent evasion of the

statute, designed and intended to defeat the objects of that statute.

If it were the intention of the legislature to provide that after July 1, 1883, it shall be unlawful for any person to keep a dram-shop without having a license for which he has paid in advance a sum not less than at the rate of $500 per annum, no such intention is expressed or reasonably suggested by the words of the act or the condition of things at the time the act was passed. No one is warranted in saying that an act containing an express provision to that effect could or would have had the sanction of the law-making power. The statute, under our constitution, by its terms relates solely to licenses *to be issued after* July 1, 1883. There is not a word in the statute suggestive in the slightest degree of an intention to invalidate licenses lawfully issued before July 1, 1883. It was a fact well known to the General Assembly that many licenses in different parts of the State had been issued before the passage of the act, the period of which, on their face and under laws and ordinances then in force, would extend beyond the 1st of the then next July. If it had been intended to invalidate such licenses on and after that date, some language indicating that purpose would undoubtedly have been employed. No such language being found in the statute, courts are not at liberty to attribute such a purpose to the act, or to incorporate words into the statute expressive of a purpose not in any way indicated by the words of the statute.

Lastly, did the proceedings occurring after the passage of the act constitute a fraud upon the law, or an unlawful evasion of the law, designed to defeat the objects of the statute? These proceedings must be held to have been intended to produce the results naturally arising from their occurrence, whatever may have been the private promptings in those who brought them about. It must therefore be assumed that the intention in the passage of the ordinance of June 18, 1883, and that of June 28, was to enable parties

in Chicago to procure licenses before July 1, 1883, at a rate less than that of $500 a year, under which they might keep, in that city, dram-shops until April, 1884. Is this an evasion of the statute? We think it is not. It neither evades, avoids nor violates that statute in any respect whatever.

Our constitution provides, that unless the General Assembly shall otherwise direct by a vote of two-thirds of all the members elected to each house, *no act* shall take effect until the 1st day of July next after its passage. One of the great purposes of this provision was to enable the people to prepare for the operation of the statute when it shall come into force. Under our constitution, then, this statute, passed June 15, 1883, simply provided that after July 1, 1883, it shall not be lawful for the corporate authorities of any city, town or village to grant a license for the keeping of a dram-shop, except upon the terms and conditions stated in the act. Had the provision been, that after January 1, 1884, no license to marry should issue except on payment of a fee of $100, and had a previous statute provided that all marriage licenses should authorize marriages under the same at any time within two months after the dates of their issue, and not after, would it have been an unlawful evasion of the new statute for a party wishing to marry on February 1, 1884, to take out a license in December, 1883, so as to get a license at a cheaper rate? Nothing being said in the new statute about the effect of licenses to be issued before January 1, 1884, the law as to such, in the case supposed, would remain unaffected by the new statute. Again, had a statute been passed June 15, 1883, to come in force July 1, 1883, saying: "Hereafter no person shall lend any money at a rate of interest greater than four per cent per annum, and any one violating this act shall forfeit all interest upon such loan," and had some money lender sent out his agents and lent large amounts of money on June 30, 1883, for the coming year, at interest at the rate of eight per cent per annum, can any one doubt the validity

or legality of such loan? Could it be held that this was a violation of the statute, or an unlawful evasion of the same? It seems to us not. Again, should Congress pass a statute fixing the import duty, after the 1st of January next, upon an article of merchandise at one hundred per cent upon its value, the present duty being but twenty per cent, would it be a fraud upon the law, or an unlawful evasion of the law, for one of our importing merchants to hasten to Europe and ship into this country a quantity of such merchandise, at twenty per cent duty, sufficient to supply his trade for years to come, and to do so for the express purpose of avoiding the necessity of paying the one hundred per cent duty after January next? Other illustrations might be given, but these suggest the view we take of the proceedings under which the license under consideration was issued.

The statutes in force at the date of the passage of the act under consideration, which provided for modes in which licenses might lawfully continue to be issued between that date and July 1 next thereafter, being all left in force unaffected by the passage of that act, we know of no reason why city councils might not lawfully exercise all such powers as the law cast upon them, until the inhibitory statute came into force. After the passage of the act of June 15, the city council had full power to change the municipal year, and also full power to prescribe the conditions upon which licenses might be issued between that date and July 1, 1883, and to fix the time under the law when such licenses should expire. These powers were in no way affected by the new act, for it could have no legal effect until it came into force. These powers were exercised in compliance with existing laws. It is not the function of courts to enact, amend or repeal statutes. No matter how desirable it may seem that the law should be otherwise than it actually is, courts can do nothing, lawfully, but declare and enforce it as they find it.

As to the form of action, a majority of the court are of opinion that under our present statute the validity of such a license can lawfully be tested by an information in the nature of a *quo warranto.* In this view the writer of this opinion does not concur. His own views on that subject are therefore presented.

Prior to the act of 1881, in cases other than those instituted to declare a forfeiture of some valid franchise or office, this kind of writ did not lie in any case except for usurpation of some *franchise,* or intrusion into some public office or some office in some corporation created by this State. By the act of May 27, 1881, in force July 1, 1881, our statute was so amended as to extend this writ to cases where any person shall hold, or claim to hold or exercise, any "privilege, exemption or license" which has been improperly, or without warrant of law, issued or granted by any officer, board, commission, court, or other person or persons authorized or empowered by law to grant or issue such privilege, exemption or license. It is claimed that a license to keep a dram-shop is such a privilege and license. It is plain to me that *all* licenses and *all* privileges which come within the letter of this statute are not included in its spirit and legal effect. Such a construction would lead to absurdities too gross to be thought within the meaning of the legislature. Under such a construction, we might have a proceeding in the nature of a *quo warranto* to test the right of a neighbor to pass over the owner's land to a convenient well. To do so would doubtless be a "privilege," and the permission to do so would, in the popular sense, be a "license," and the owner is surely "authorized and empowered by law to grant and issue" to another the "privilege" or the "license" to so pass over his land, and in so doing, to grant an "exemption" from liability as a trespasser. This is all within the letter of the statute. Such a construction would enable a landlord to test the right of the tenant to any privilege or exemption the tenant

might claim under the provisions of his lease. In the same manner this proceeding might be invoked to test every petty license known to the law,—a license to drive a dray or hack, a license to keep a peanut stand or a pet dog. I do not believe it was intended by this amendment to work such a revolution in legal proceedings in this State as would necessarily spring from such a construction of this statute. By the rules governing proceedings of this character, a defendant can not put in a general denial of wrong, and then await the proof of his assailant. A plea of not guilty does not prevail in *quo warranto* proceedings. The defendant must disclaim, or avow and justify, his claim, and the burden of proof rests upon the defendant if his claim is denied. I do not think that it was intended by this statute to give so wide a range to special proceedings of this kind. Some rational construction must be given to this amendatory statute, consistent with its words and the apparent reasonable purposes of the act, in view of all its words and the nature of the subject. To determine the intention and legal effect of the statute, obviously the line must be drawn somewhere by construction, and so as to give effect to the same, and yet exclude a construction which leads to a preposterous conclusion. It is plain, as I have suggested, that every kind of privilege, exemption or license is not embraced within the spirit of the statute. The question is, what exemptions, etc., are intended to be embraced.

Writs of *quo warranto*, and proceedings on information in the nature of *quo warranto*, have long been in use, and have usually been confined to the matter of usurpation of franchises or intrusion into public offices, and from the nature of such proceedings they are not well adapted to any subject matter which does not relate in some degree, in its character, to that of a public office or that of a franchise. Before 1881 our statute had extended this kind of proceeding to the intrusion into an office in a corporation created by authority of

this State, which in some degree partakes of the nature of a public office. Before the passage of the amendment of 1881 it had been held by this court that a license by a city to a railroad corporation to run its track along a public street was not a franchise, although it does partake, in some degree, of the nature of a franchise, in this, that it is a privilege to do that which all men, at common law, have not a common right to do, and in that it is a privilege which, under our statutes, may be granted to some. (*Chicago City Ry. Co.* v. *The People,* 73 Ill. 547, and *Metropolitan City Ry. Co.* v. *Chicago West Division Ry. Co.* 87 id. 322.) It had also been held, membership in the board of trade was not a franchise, in the strict sense of that term, although it carried with it privileges not enjoyed by all as of common right. It was there said that the term "franchise" had a technical meaning and also a popular meaning, and in construing a statute where that term was used, it was held that the technical meaning, and not the broader and popular meaning of the term, should be adopted. This amendatory act of 1881 was passed after these decisions were made, and it seems reasonable that it was the intention of this act to extend this proceeding only to privileges, exemptions and licenses which in their nature partake somewhat of the nature of a franchise, and yet are not strictly franchises, and this in the same way that the same proceedings had before that time been extended to intrusion into an office of an Illinois corporation, which in its character did in some degree partake of the nature of a public office.

I think the privileges, exemptions and licenses brought within proceedings of this kind by that amendment are only such as partake in some degree of the nature of a franchise, and as were not, at common law, enjoyed by all citizens as a matter of common right, and yet such as, to be held, had to be granted specially by some lawful authority, but were *not* such as were granted directly from the State, so as to fall within the technical meaning of the term "franchise."

In consideration of the necessity, as shown above, of adopting a construction which is less broad than the letter of the amendment, and in consideration of the nature of proceedings upon information of this kind, and in consideration of the condition of the law at the time of the passage of the act, I think no better rule can be adopted. The view that it was intended to extend this remedy only to such privileges, exemptions or licenses as partake somewhat of the nature of a technical franchise, seems to be strengthened by the language of that part of this amendatory act which prescribes the character of the judgment to be rendered. The court, in case of conviction under this act, is required to give judgment of ouster against such person "from the office or *franchise*," and to fine such person for usurping "such office or *franchise*." Nothing is said expressly in this new statute about a judgment of ouster, or fine, in relation to any "privilege, exemption or license," and yet it is manifest that judgment of ouster and fine was intended to be entered in cases embraced in the new statute, and not embraced in the old statute. The fact that all these cases are classified, in the section as to judgment, under the head of "office or franchise," is cogently suggestive of the idea that *only* such privileges, exemptions and licenses as partake in their nature of the character of a franchise, were intended to be brought within the purview of this statute. I am inclined to think that by the words "privileges, exemptions and licenses," as used in this amendatory act of 1881, were meant only such privileges, exemptions and licenses as were not, at common law, enjoyed by all citizens as of common right. No better limitation occurs to my mind. Obviously, a license to keep a dram-shop, by such a test, does not fall within the statute. Every citizen, at common law, had the right to keep a dram-shop as of common right. The position that this remedy is not the one appropriate to such a case, is fortified by the fact that in the Dram-shop act the mode in which offenders against that statute are to be pun-

ished is expressly provided, and yet no mention is there made of proceedings on information in the nature of a *quo warranto*.

From the language of the record in this case it seems that the Attorney General, and the court pronouncing the judgment in this case, entertained the view that a license, to be a proper subject for this writ, must in some way partake of the nature of a franchise. The information expressly charges appellants with the usurpation of "the *franchise*, privilege and license" to retail liquors, etc., and the judgment is, that appellants be ousted from "the exercise of the franchise, privilege and license" of selling, etc. I am authorized to say that Justices MULKEY and CRAIG concur with me in the view that under this statute such information is not a proper remedy for testing the validity of such a license.

The judgment of the Superior Court of the county of Cook is reversed, and the information is dismissed.

*Judgment reversed.*

Mr. JUSTICE SCOTT: I concur in holding that *quo warranto* is a proper remedy for testing the validity of the license in this case, but I dissent from that portion of the opinion which holds the license in question is valid.